Filed 6/15/15  In re Butler CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ROY THINNES BUTLER,<br><br>    on Habeas Corpus. | A139411<br><br>(Alameda County<br>Super. Ct. No. 91694B) |

This opinion resolves the parties' dispute over attorneys fees.  As explained in detail in our prior published opinion (*In re Butler*, A139411, May 15, 2015), parole eligible life prisoner Roy Thinnes Butler challenged the constitutionality of the parole process used by the Board of Prison Terms (Board) for prisoners such as himself.  The parties resolved the matter with a settlement under which the Board is required to announce and implement certain new parole policies and procedures.  Butler then filed a motion for an award of reasonable attorney fees under Code of Civil Procedure section 1021.5 (section 1021.5).  We found that Butler is entitled to reasonable attorney fees but that the amount he requested was excessive and unreasonable.  Accordingly, our prior opinion granted the motion and ordered the parties to attempt to reach agreement on the amount of fees and costs.

Having been informed that the parties have not been able to reach agreement, we now proceed to decide the matter.  We shall conclude Butler is entitled to a fee award of $194,300.

1

## BACKGROUND

On October 21, 2014, Butler filed a Motion for Request for Award of Reasonable Attorneys' Fees (motion) seeking $439,421.65. The motion was accompanied by a memorandum of points and authorities and two declarations. The declaration of the lead attorney, Jon B. Streeter, stated that "Keker & Van Nest specializes in complex civil litigation," that the issues in this case were factually and legally complex, and that consistent with the firm's usual practice he assigned two more junior attorneys to work with him on the case, Sharif E. Jacob, a senior associate, and Benita Brahmbhatt, a junior associate. The Streeter declaration also stated that Streeter, then a partner at Keker & Van Nest, "personally coordinated, managed, and made all strategically important judgments on every aspect of the work on Mr. Butler's case."[1]

The declaration further stated that the firm was "claiming fees only for time spent litigating Mr. Butler's base term claim and for the Fee Motion" and not for time spent on Butler's individual claim. However, the firm had for some time used "a single billing code" for all aspects of the case, and it was "not possible to determine from evaluating the billing code connected to the time entry whether a time entry was attributable to Mr. Butler's systemic base term claim, which is the subject of this Motion, or to other matters, such as Mr. Butler's individual claim, for which Keker & Van Nest is not seeking to recover fees." The declaration stated that Streeter had reviewed all of the billing invoices and excluded entries that "do not appear to relate to time spent on the base term claim or the Fee Motion," but "where a time entry relates to time spent on both the individual claim and the base term claim, I have employed a categorical rule to claim 50% of that time for this fee motion." He expressed his belief that this was a

---

[1] As we have said, Jon B. Streeter is now Justice Streeter. It is, needless to say, somewhat awkward to pass upon the reasonableness of a fee request submitted by counsel who is now a member of this court. That said, someone must do it, and as the Division in which the underlying appeal was litigated (and not the division in which Justice Streeter now sits), we are the only division familiar with the relevant proceedings.

2

conservative allocation that would "ensure that fees are not inadvertently claimed for work done on any issues other than the base term claim or the fee motion."

The Streeter declaration indicated that hourly rates on which the requested lodestar amount was calculated were $950 for Streeter, a 1981 law school graduate, $575 for Jacob, a 2007 law school graduate and $500 per hour for Brahmbhatt, a 2010 law school graduate, and $260 for a paralegal. It attested that these were the "standard billable hourly rate[s]" charged by Keker & Van Nest to its paying clients in 2013 and that they "are consistent with the prevailing hourly rates for law firm attorneys in the San Francisco Bay Area." The declaration attached a "summary of the attorney and paralegal hours that were billed during the course of this matter," which reflects that petitioner was seeking compensation for 320.69 hours allocated to the base term claim and 134.18 hours spent on the fee motion itself. Specifically, the summary indicates, the motion sought compensation for about 152 hours of Streeter's time, 191 hours of Jacob's time, 304 hours of Brahmbhatt's time, and 123 hours of paralegal time.[2]

The second declaration accompanying the motion was that of Michael Bien, attesting to the reasonableness of the rates sought.

On November 5, the Attorney General filed vigorous opposition to the motion, asserting that Butler was not entitled to fees under section 1021.5 and that, in any case, the amount of fees requested was unreasonable. The Attorney General complained about the absence of "attorney documentation of the hours expended" such as "detailed billing records," and the corresponding lack of "detail or explanation as to how the hours were spent." The Attorney General went on to criticize the cumulative hours spent on various

---

[2] The Streeter declaration also described two experts hired by the Keker firm to assist with the case. Attachments to the Streeter declaration besides the summary include the web page description of the Keker firm's pro bono practice, the web page biographical sketches of the three attorneys for whom fees were sought, the declaration of one of the experts retained by the Keker firm in this matter, a memorandum issued by the state announcing the settlement agreement in this case, and an answer apparently filed by the Attorney General to a request filed by two non-party district attorneys after the parties settled the case seeking to divest this court of jurisdiction and transfer the case to the California Supreme Court.

tasks and argued that "Butler provides no evidence that the hourly rates claimed . . . are the 'prevailing hourly rates' for comparable legal services in the community." As alternative fee criteria, the Attorney General observed that "[e]xperienced and capable attorneys at the First District Appellate Project who handle the vast majority of pro se habeas petitions filed in this court, bill at a rate of $65 to $86 per hour" and "[c]ounsel for respondent, whose eight-year practice consists solely of representing the State in habeas matters, bills at a rate of $170 per hour." The Attorney General further noted that "if this case had been brought in the federal courts, appointed counsel for a pro se inmate such as Butler could bill no more than $125 per hour." She suggested that the rates sought by Butler "may be standard in the context of corporate civil litigation, but do not reflect the rates charged by attorneys who regularly practice in the field of criminal and correctional appeals."

Butler filed a reply, which did not address the absence of records.

On December 1, we set the matter for oral argument on December 17, advising the parties that, "In addition to the issues raised in the briefing, the court is interested in the following additional issues: [¶] 1. Whether the record before us provides an adequate basis upon which to determine a reasonable fee."

On December 15, we received a "Declaration of Sharif E. Jacob in Support of Petitioner's Motion to Supplement the Record." The declaration attached a spreadsheet Sharif described as "listing the line-item billing entries for all legal work Keker & Van Nest LLP had performed on behalf of Mr. Butler as of the date of filing his motion for attorneys' fees," which "formed the basis for the fee calculations set forth in [the summary document attached to the Streeter declaration]."

The Attorney General filed opposition to Butler's motion to supplement the record.

That was the context in which the fee motion came on for oral argument. At the conclusion of the argument, we ordered that Jacob's supplemental declaration would be filed, but provided the Attorney General opportunity to file a supplemental opposition, and Butler a reply. We received and reviewed that briefing.

4

On May 15, 2015, we filed our prior opinion in this case, concluding that Butler is entitled to reasonable attorney fees. We ordered the parties to meet and confer in an attempt to agree on the precise amount to which Butler is entitled, and stated that if they were unable to do so, this court would decide the matter on the basis of the declarations and other evidence the parties had submitted.

On June 4, 2015, the parties filed their Joint Status Report stating that they had not been able to reach agreement, Butler having declined to accept the Board's offer of $83,151.25 and the Board having declined to accept Butler's offer of $195,000.

## DISCUSSION

"Whether an award is justified and what amount that award should be are two distinct questions . . . ." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 647, citing *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 322–324.) Fundamental to the latter inquiry is what is reasonable. *(Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 18 ["the fee must above all else be reasonable" ].)

### I.

### *Reasonableness is Determined Under the Lodestar Method*

As our Supreme Court has stated, "[i]n *Serrano* [*v. Unruh* (1982) 32 Cal.3d 621 (*Serrano IV*)], [with respect] to the statutory fee award under Code of Civil Procedure section 1021.5, we reiterated that fee awards should be fully compensatory. We approved the calculation of attorney fees beginning with a lodestar figure based on the reasonable hours spent, multiplied by the hourly prevailing rate for private attorneys in the community conducting *noncontingen*t litigation of the same type. (*Serrano IV*, . . . at p. 625.) We remarked that the reasonable value of attorney services is variously defined as the ' "hourly amount to which attorneys of like skill in the area would typically be entitled." ' (*Id.* at p. 640, fn. 31 . . . ) . . . [¶] We held in *Serrano IV* that, absent circumstances rendering the award unjust, an attorney fee award should ordinarily include compensation for *all* the hours *reasonably spent*, including those relating solely

5

to the fee.  ([*Id.*] at pp. 624, 639.)"  (*Ketcham v. Moses* (2001) 24 Cal.4th 1122, 1133 (*Ketchum*).)

The *Ketchum* court noted the many times our Supreme Court has reaffirmed the lodestar methodology as the basis for determining a reasonable fee.  (*Ketcham, supra,* 24 Cal.4th at pp. 1134-1135, discussing *Press v. Lucky Stores, Inc., supra,* 34 Cal.3d at p. 322; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294-1295; and *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)  In each of the cases cited, the court stressed that determination of the amount of a fee award must begin with the lodestar, i.e., multiplication of the reasonable hourly rates by the number of hours reasonably expended.  Further, while recognizing that the lodestar is the starting point and is "fundamental to arriving at an objectively reasonable amount," the court also repeatedly acknowledged that the lodestar may then be adjusted based on "consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided.  (*Serrano* [*v. Priest* (1977)] 20 Cal.3d [25], 49 [(*Serrano III*)].)"  (*Ketchum*, at p. 1134.)  The court reaffirmed this approach yet again in *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 579 [" 'anchoring the calculation of attorney fees to the lodestar adjustment method " 'is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.' " [Citation.]' ")

Use of the lodestar does not, however, mean a party seeking attorneys' fees is "necessarily entitled to compensation for the value of attorney services according to the owner's own notion or to the full extent claimed by [him]."  (*Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 950 [inverse condemnation]; *Levy v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807, 813–814 [Song-Beverly Act].)  A party seeking fees has the "burden of showing the fees incurred [are] 'allowable,' [are] 'reasonably necessary to the conduct of the litigation,' and [are] 'reasonable in amount.' "  (*Levy*, at p. 816.)  "In referring to '*reasonable*' compensation," the Supreme Court has "indicated that trial courts must carefully review attorney documentation of hours expended; 'padding' in the form of inefficient or duplicative

6

efforts is not subject to compensation." (*Ketchum, supra,* 24 Cal.4th at p. 1132.)  The lodestar approach takes as the starting point the hourly rates multiplied by the number of hours spent.  But the court must assess whether the rates and hours for which compensation is sought are reasonable, and if not, reduce them.  Further, once the court determines the lodestar, it may then adjust that amount upward or downward based on prescribed factors.

" 'Under *Serrano III,* the lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including . . . (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award.  [Citation.]  The purpose of such adjustment is to fix a fee at the fair market value for the particular action.  In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1259, italics omitted.)

A party who is only partially successful is not entitled to compensation for fees expended on unsuccessful claims or claims that are unrelated to those on which the party prevailed (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989-990.)  Even where a party prevails in part on a suit that encompasses unsuccessful but related claims, a reduction may still be called for if the overall fee is excessive in light of the result.  " 'A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole.' " (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 1019.)  As explained in *Hensley v. Eckerhart* (1983) 461 U.S. 424, "[i]f . . . a plaintiff has achieved only partial . . . success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount . . . even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith." (*Id.* at p. 436.)

Finally, trial courts are typically the forum in which fee determinations are initially made, and we give great deference to those courts. The " ' " 'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " ' (*Ketchum, supra,* 24 Cal.4th at pp. 1131–1132.)" (*Graham v. DaimlerChrysler Corp.*, *supra,* 34 Cal.4th at p. 579.) Here, however, the litigation was initiated and pursued in this court, and it is this court that is in the best position to value the legal services rendered in this case.

## II.

### *The Amount of Fees Requested is not Reasonable*

In order to evaluate whether the $439,421.65 sought by Butler is reasonable, and in particular to assess whether the rates charged and hours expended can be justified, some background about the underlying litigation is necessary. As previously explained, counsel was appointed to represent a prisoner regarding an issue that affects thousands of other state prisoners. While the lawyer appointed was Streeter, then a partner in a large law firm, it is generally understood that a lawyer appointed by the court who is a member of such a firm will bring with him or her to the representation the resources of the firm, including the firm's associates. Moreover, the significant claims Butler advanced, which had not previously been adjudicated by any appellate court since enactment of the determinate sentencing law (DSL), could not succeed without substantial discovery. Fashioning and implementing a discovery plan and enforcing discovery requests in a class action-like case against a state agency possessing substantial resources is daunting. To succeed, counsel would require not just deep commitment and tenacity but considerable trial and appellate expertise in complex cases.

The habeas corpus petition Butler filed in propria persona essentially advanced the same claim that had been unsuccessfully pursued in *In re Morganti* (2012) 204 Cal.App.4th 904 (*Morganti*). Morganti claimed the Board " 'systematically and arbitrarily denies parole to all parties at or near their MEPD (minimum eligible parole date), and thus is disregarding the statutory framework that makes parole the norm and

8

denial of parole the exception.' " (*Id.* at p. 914, fn. 4.) A majority of this court declined to address these claims for two reasons: First, because they were moot, as we agreed there was not "some evidence" Morganti will pose a risk of danger to society if released from prison and affirmed the order granting habeas corpus relief on that sufficient ground; and second, because Butler's other claim "is conclusory, and not adequately developed." (*Id.* at pp. 914-915, fn. 4.) In a separate opinion, Presiding Justice Kline agreed there was not "some evidence" Morganti posed a risk to public safety. However, because he believed the evidence Morganti presented in support of his due process claim was undisputed and credible, placed the integrity and lawfulness of the parole process relating to life prisoners in question, and bore upon the rights of thousands of other life prisoners, Justice Kline would have remanded the case to the trial court with directions to grant Morganti's request for discovery and an evidentiary hearing. (*Id.* at pp. 928-929, conc. & dis. opn. of Kline, P.J.) In describing the credibility of Morganti's claim and why he believed it deserved judicial attention, the separate opinion described at considerable length the manner in which the parole process can impermissibly facilitate disproportionate sentences and drew comparisons between the present parole process and that of the Adult Authority condemned in *In re Rodriguez* (1975) 14 Cal.3d 639. The writ petition Butler prepared in propria persona, which was filed nine months after issuance of our decision in *Morganti*, was obviously based upon the analysis set forth in the separate opinion in that case. Butler's chief claim was that the Board refused to set a term "proportional to his culpability," and the Board's failure to fix any term early in the process obstructed his ability to challenge his punishment as constitutionally excessive.

After receiving Butler's pro. per. petition, we filed a three-page order in which we described the issues raised by him, discussed the relevant case law, and stated that Butler's claim that the Board's deferral of setting the base term until after an inmate is found suitable for release results in sentences disproportionate to inmates' individual culpability "may benefit from further briefing." The order appointed counsel "to investigate and research whether to file a supplemental petition that: (1) refines petitioner's contention that the current practice of the Board, prescribed by the agency's

9

regulations and approved in *In re Dannenberg* (2005) 34 Cal.4th 1061—i.e., setting the base term only after a finding of suitability—results in disproportionate sentences and/or obstructs judicial review of the proportionality of the sentences resulting from the Board's practice, and (2) addresses the question whether petitioner's ability to make such a showing requires discovery of statistical information and any other relevant information maintained by the Board—such as, for example, the percentage of inmates granted release on parole over a recent period of time who at the time of their release date had already served more time than their subsequently determined base term—and, if so, the manner in which discovery of such information should be carried out." Shortly thereafter, we filed another order, submitted by the First District Appellate Project, specifically appointing Streeter to represent Butler on appeal, and directed counsel, if he decided to file a supplemental petition, to serve it on the Attorney General with any supporting papers within 30 days.

About three and a half months later, after requests for extensions of time were granted, appointed counsel filed a supplemental petition for writ of habeas corpus on behalf of Butler. The petition expanded Butler's claims beyond his original petition and our subsequent order in two significant respects. First, it asserted that the Board's denial of parole was not supported by "some evidence" a claim Butler had not himself previously advanced. Second, it added to the base term challenge the assertion that the Board's decisions regarding whether an inmate poses an unreasonable risk to society are arbitrary.

Both of the new claims or theories would require considerable attorney time and attention beyond the issues for which we appointed counsel. Most of the supplemental petition, and about half of the accompanying memorandum of points and authorities, focused on the facts and arguments relating to the some-evidence claim. To demonstrate that the parole decision regarding Butler was arbitrary and that Butler posed no significant risk to society would require significant factual research focused on Butler, his offense, his prison conduct, and his parole hearings. Likewise, counsel's attempt to prove that the Board's decisions in thousands of other cases were arbitrary and did not

10

accurately assess the risks inmates posed to society would be an enormous undertaking. Indeed, much of the discovery counsel sought through its discovery requests and ultimate motion to compel pertained to this new aspect of the base term challenge,[3] as did all of the work counsel did to identify and retain expert witnesses.

In the end, the some-evidence argument was successful for Butler individually, but it did not affect any larger group of inmates and Butler does not seek attorney fees for counsel's representation on this individual claim. The new claim that the Board was not accurately or fairly assessing inmate risk did not directly produce any fruit in this case. As explained above, the case was settled on the basis of the base term argument Butler asserted in his original petition based on the similar claim made in *Morganti*: that the Board is required to set prisoner's base terms before they are found suitable for parole, and indeed no later than when they first become eligible for parole. The effect of the settlement was to add to the mix of information available to inmates and the Board for consideration in parole hearings the base and adjusted base terms, i.e., information reflecting a sentence that will achieve a degree of uniformity and proportionality. However, the settlement effected no change to the Board's criteria or process for assessing whether inmates pose a risk to public safety.

We do not criticize counsel's decision to add this significant new theory to Butler's petition or to pursue it prior to the settlement of this case. Nor do we imply any view on the merits of the theory or its likelihood of success had it been litigated to its conclusion. But Butler is not entitled to recover attorney fees for the considerable amount of time counsel spent on a theory that was not part of the challenge on which he ultimately (through the settlement) prevailed to the benefit of a large class of persons. (*Chavez v. City of Los Angeles, supra,* 47 Cal.4th at pp. 989-990.)

---

[3] The supplemental petition described the accompanying discovery request as designed to show three things, one of which was that "more than 96% inmates who have already served their adjusted base terms are low risk for recidivating according to California's own risk assessment tools."

11

# III.

## *Determination of a Reasonable Fee Award*

### A.

We turn first to the issue of reasonable hourly rates. As already noted, Butler seeks fees for time spent by three attorneys and one paralegal at the following hourly rates: $950 for a partner and 1981 law school graduate; $575 for a "senior associate" and 2007 law school graduate; $500 for a "junior associate" and 2010 graduate; and $260 for a paralegal. The attorneys' biographical information, attached to the Streeter declaration, is certainly impressive. No information about the paralegal's experience was offered.

The declaration of Michael Bien opined that these rates "are reasonable relative to the prevailing rates in the San Francisco Bay Area for attorneys with similar skills and experience for work of this complexity." Notably, however, the Bien firm's own 2014 rates for attorneys of similar vintage to those for whom Butler seeks compensation here are significantly lower. This is so despite the fact that Bien attested those rates are set based on his firm's "careful analysis" done each year of rate information gathered from "numerous law firms and review articles and other sources of information . . . regarding rates in the San Francisco Bay Area." For Bien, who is a 1980 law school graduate, his firm's 2014 "hourly rate for litigation is $800." His firm's associates "with law school graduate dates from 2007 to 2010, bill at rates ranging from $390 to $450 per hour." And for paralegals, his firm charges $230 to $290 per hour "based on experience and level of training." Bien stated these rates are "at or below the rates charged by many comparable attorneys in the San Francisco Bay Area and numerous other locales within California for work on complex litigation" and that in earlier years "[t]he State of California has regularly stipulated" to pay his firm's "regular hourly rates" in a "prisoner/parolee civil rights ADA class action" in the Northern District and "several other prisoner/parolee class actions in the Eastern District" and that the federal District Court for the Northern District, the Ninth Circuit and this court have upheld the firm's rates in these and other cases.

12

The hourly rates to be used in computing the lodestar must be "within the range of reasonable rates charged by and judicially awarded comparable attorneys for comparable work."  (*Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 783; *PLCM Group, Inc. v. Drexler, supra,* 22 Cal.4th at p. 1095 ["The reasonable hourly rate is that prevailing in the community for similar work"].)  Particularly where it is difficult to obtain evidence of market based rates for the same type of work, the courts look at fees charged for cases requiring similar skills.  (See, e.g., *The Utility Reform Network v. Public Utilities Com.* (2008) 166 Cal.App.4th 522, 536-537; *Prison Legal News v. Schwarzenegger* (9th Cir. 2010) 608 F.3d 446, 454-455 ["all attorneys in the community engaged in 'equally complex Federal litigation,' no matter the subject matter"].  The burden is on the fee applicant to produce evidence that the requested rates are in line with those prevailing in the community for similar work.  (*Hensley v. Eckerhart, supra,* 461 U.S. at p. 437; *ComputerXpress, Inc. v. Jackson*, *supra*, 93 Cal.App.4th at p. 1020.)  " 'Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate.' " (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1009, citing *United Steelworkers of America v. Phelps Dodge Corp.* (9th Cir.1990) 896 F.2d 403, 407.)

We consider—but are not bound by—the declaration submitted on behalf of Butler opining that the rates sought by his counsel are " 'market rate' for services of this type." (*Syers Properties III, Inc. v. Rankin* (2014) 226 Cal.App.4th 691, 702.)  It is within our discretion, based on the evidence in the record and our own experience, to determine how "sophisticated" the services provided were and whether the rates sought are market rate for services on matters of similar complexity and difficulty.  (*See ibid.*)

The base term challenge was, in light of the circumstances, moderately complex. On the one hand, the statutory and constitutional claims had not been advanced and judicially tested since enactment of the DSL four decades ago, and pertained to an administrative process that takes place behind prison walls and is unknown to most

13

lawyers, including most of those who represent indigent inmates in conventional habeas corpus proceedings. Additionally, establishing Butler's constitutional claims would necessitate extensive and burdensome discovery of statistical and other information relating to the parole process maintained by the Board, the California Department of Rehabilitation and Corrections, and perhaps the California Department of Justice and other agencies. Obtaining, organizing, and evaluating this information would likely prove daunting, and these matters would have to be promptly thought out by counsel. Further, the Board was represented by the Department of Justice, which possesses considerable expertise regarding the parole process, and many other resources.

On the other hand, the separate opinion in *Morganti*, provided a roadmap for the uninitiated regarding the nature of the parole process, and the constitutional bases of Butler's base term challenge.

The evidence Butler offered regarding hourly rates, which consists only of the rates of the Keker firm and one other firm, is less than weighty. At the same time, the rates suggested by the Attorney General—namely, those charged by government and appointed counsel—do not reflect the relevant market. (*Prison Legal News v. Schwarzenegger, supra,* 608 F.3d at p. 454 [private news company suing for reform of prison rules regarding dissemination of publications not limited to prisoner attorney rates for similar litigation where latter are limited by statute]; *Trevino v. Gates* (9th Cir. 1996) 99 F.3d 911, 925 [attorneys retained by government were not acting as private attorneys and were not in same legal market as private attorneys who litigate civil rights cases]; see also, *Syers Properties III, Inc. v. Rankin, supra,* 226 Cal.App.4th at pp. 699, 701-702 [market rate is based on rates prevalent in community for " 'equally difficult or complex types of litigation' "; " '[t]his standard applies regardless of whether the attorneys claiming fees charge nothing for their services, charge at below-market or discounted rates, represent the client on a straight contingent fee basis, or are in-house counsel' "]; *The Utility Reform Network v. Public Utilities Com., supra,* 166 Cal.App.4th at pp. 536-537 [trial court abused discretion in limiting rates of outside counsel representing intervenor in litigation concerning deregulation of electric power not limited to those

14

charged by PUC practitioners; rates must be based on market rates for persons of comparable experience offering similar services].)  As noted in *Prison Legal News*, the rates of a government attorney are not a reflection of any market but typically are based on overhead costs to government for operation of the government law office, and appointed counsel's rates for representing prisoners before the parole board or in court are severely constrained by budgets if not legislation.

Since neither party provided an adequate record upon which we could confidently assess appropriate hourly rates for this case, we have consulted recent fee decisions issued by California state and federal courts in a range of matters that can be described as moderately complex.  These decisions reflect hourly rates for attorneys with experience[4] similar to and greater than that of Streeter ranging from $425 to $875.[5]  A review of recent fee cases reflects rates ranging from $245 to $400[6] for attorneys with the same or

----

[4] In a few instances where we consulted an opinion that provided rates but did not state the graduation date or years of experience of an attorney that appeared potentially relevant, we obtained that information from the California State Bar website.

[5] *Stonebrae, L.P. v. Toll Bros., Inc.* (N.D.Cal., Apr. 7, 2011, C-08-0221-EMC) 2011 WL 1334444, at *16 affd. (9th Cir. 2013) 521 Fed.Appx. 592 ($675 for partner [Kirkham] with 35 years experience in commercial case of moderate complexity); *Altavion, Inc. v. Konica Minolta Systems Laboratory Inc.* (2014) 226 Cal.App.4th 26, 71 ($600 for attorneys admitted in 1978 and 1986 in technology-related trade secret litigation); *Postier v. Louisiana-Pacific Corp.* (N.D.Cal., Apr. 29, 2014, 09-CV-03290-JCS) 2014 WL 1760010, at *5 ($425 for partner admitted to bar in 1983 in class action alleging product liability); *Rosenfeld v. U.S. Dept. of Justice* (N.D.Cal. 2012) 904 F.Supp.2d 988, 1002 ($700 for attorney with 28 years experience for services in FOIA suit against DOJ and FBI); *Holman v. Experian Information Solutions, Inc.* (N.D.Cal., Dec. 12, 2014, 11-CV-0180 CW (DMR)) 2014 WL 7186207, at **4, 5 ($750 for Andrew Ogilvie, admitted to State Bar in 1973, with expertise in class action under Fair Credit Reporting Act).

[6] *Stonebrae, L.P. v. Toll Bros., Inc, supra,* 2011 WL 1334444, at *16 ($300 for 2005 bar admittee [Aarons]); *Postier v. Louisiana-Pacific Corp., supra,* 2014 WL 1760010, at **5, 6 ($235 and $295 for attorneys with seven years experience); *Pham v. Watts* (N.D.Cal., Sept. 24, 2014, 14-CV-02247-VC) 2014 WL 4748274, at *1 ($400 for attorney with six years experience for work on remand motion); *Rosenfeld v. U.S. Dept. of Justice, supra,* 904 F.Supp.2d at page 1002 ($250 for attorney with 10 years experience); *Syers Properties III, Inc. v. Rankin*, *supra,* 226 Cal.App.4th at page 695

similar years of experience to Keker's senior associate, and from $200 to $300[7] for attorneys with the same or more experience than Keker's junior associate.  And we find cases awarding $150 for services performed by paralegals in the Bay Area legal community.[8]

Considering the evidence submitted, the hourly rates awarded for services of counsel with similar experience in a variety of recent state and federal cases, the fact that the instant case was, for the reasons set forth above, only moderately complex, we conclude that the reasonable hourly rates in this case for the counsel and paralegal who performed the services in the case are as follows:

| | |
|---|---|
| Partner Streeter (1981 law school graduate): | $800 |
| Senior Associate Jacob (2007 law school graduate): | $350 |
| Junior Associate Brahmbhatt (2010 law school graduate): | $250 |
| Paralegal (experience and certification unknown): | $150 |

We recognize these rates are less than the Keker firm actually charges for these attorneys to fee-paying clients whose high profile cases that firm, by virtue of its talent and reputation, is often able to attract.  But this case did not require services at the level

($300 per hour for services performed by associates admitted to bar in 2006 in legal malpractice action); see also *Holman v. Experian Information Solutions, Inc.* (N.D.Cal., Dec. 12, 2014, 11-CV-0180 CW (DMR)) 2014 WL 7186207, at **4, 5 ($450 for Balam Letona, 2003 bar admittee).

[7] *Jimenez v. Suntrust Mortgage Inc.* (N.D.Cal., Aug. 11, 2014, 5:13-CV-04615-EJD) 2014 WL 3945836, at *3 ($235 and $250 for attorneys with four and five years experience in unfair competition, fraud and contract litigation relating to loan modifications); *Syers Properties III, Inc. v. Rankin*, *supra,* 226 Cal.App.4th at page 695 ($250 per hour for services performed by associate admitted in 2010 in legal malpractice action); see also *Pham v. Watts, supra,* 2014 WL 4748274, at *1 (any rate higher than $400 for attorney who became member of the bar six years earlier, i.e., in 2008, would be unreasonable for litigation of remand motion).

[8] *Syers Properties III, Inc. v. Rankin, supra,* 226 Cal.App.4th at page 695 ($150 per hour for services performed by paralegals in legal malpractice action);  *Holman v. Experian Information Solutions, Inc.* (N.D. Cal., Dec. 12, 2014, 11-CV-0180 CW (DMR)) 2014 WL 7186207, at **4, 5 ($150 for paralegal in Fair Credit Reporting Act class action case).

required of Keker's regular clients, and even for those clients Keker's regular hourly rates are at the very high end of the spectrum. And while Keker brought its extraordinary reputation for high quality litigation and tenacity to the table, it did not bring significant subject matter expertise or experience. As already discussed, our task is to determine reasonable hourly rates charged by comparable attorneys for comparable work.

## B.

As with hourly rates, the number of hours for which a party seeks compensation must be scrutinized by the court to ensure it is reasonable. As already discussed, compensation is not appropriate for time not well spent, and a party who is only partially successful is not entitled to compensation for fees expended on unsuccessful claims or claims unrelated to those on which the party prevailed.

Butler seeks compensation for approximately 775 hours, of which 641 were for work on the case itself, and 134 were for work on the motion for fees. The hours for the case itself consisted of two components: 320 hours billed to a matter referred to as "Systemic Base Term"; and 322 hours representing half of the total hours billed to the overall Butler matter before the firm divided into two separate billing matters the constitutional challenge to the parole board's practices in regard to setting base terms and the individual challenge to the decision denying Butler parole. We will address each of these three categories separately.

### Hours Billed to Base Term Challenge

Butler seeks compensation for 320 hours billed to the "Systemic Base Term" matter and an additional 316 hours representing 50 percent of the time billed to "both the individual claim and the base term claim" before the Keker firm separated the two into distinct matters for billing purposes. Of these hours, approximately 237 were billed by a junior associate, 190 by a senior associate, 148 by the partner and 61 by a paralegal.

For several reasons, we find these hours excessive. First, they appear significantly duplicative. Among other things, every conference in this court, whether before the panel hearing the merits or the Justice presiding over settlement, was attended by all three attorneys, which was unnecessary. We understand and encourage the use of pro bono

17

public interest litigation as a means of providing opportunities to young associates, both because it gives them experience that helps them mature as lawyers and because it teaches the importance of representing individuals and organizations that need but cannot afford their services. That said, regular hourly fee-paying clients are increasingly unwilling to pay for multiple lawyers to attend proceedings that could be adequately covered by one or two experienced attorneys. Since the lodestar measure of reasonable hours is market based, the hours here should be reduced to reflect the unnecessary attendance of multiple lawyers at conferences. Relatedly, there were an extraordinary number of internal conferences between and among the several lawyers and experts. It appears to us that this case could easily have been handled by Streeter and one associate, and that this would have significantly reduced the amount of attorney time spent on intrafirm communication and on reviewing the relevant cases.

Second, one might expect that with the type of staffing employed here, involving two associates spending large numbers of hours, the higher-billing partner would have billed considerably less than he did. Moreover, the partner billed most of his time in large blocks ranging from one to ten hours, including many two-, three-, and four-hour entries. The billing of so many large, round-numbered blocks of hours indicates the partner's billing was imprecise and appears excessive.

Third, as already discussed, the theory underlying the challenge to the Board's base term practices was well-delineated in the concurring and dissenting opinion in *Morganti*, which was the basis of Butler's pro. per. petition, and the billing records reflect that the Keker attorneys consulted heavily with Morganti's attorney, Michael Satris. The availability of the *Morganti* opinion and the petition prepared by Butler in propria persona, as well as the attorneys' access to the attorney who represented Morganti, should have significantly reduced the number of hours counsel would need to spend on the base term portion of this case.

Finally, as already discussed, in litigating what they referred to as the "systemic base term" challenge, counsel went well beyond the issue the court appointed them to address. The court's order directing appointment stated what counsel was retained to

18

address: whether, as Butler had alleged, the parole board's practice of failing to set a base term prior to when an inmate was determined eligible for parole "results in disproportionate sentences and/or obstructs judicial review of the proportionality of the sentences" set by the Board; whether discovery of statistical or other information maintained by the Board was necessary to make such a claim; and, if so, the manner in which such discovery should be carried out. Much of the work for which counsel billed time appears to be related to that issue. However, counsel for Butler bit off considerably more than it was appointed to chew by including in its petition an additional claim or theory that "The Board's Decisions Regarding Whether An Inmate Poses An Unreasonable Risk To Society Are Arbitrary." The alleged arbitrariness of the Board's assessments of dangerousness is beyond the purview of Butler's original writ, beyond counsel's assignment, was not adjudicated below, and did not in any discernible way contribute to the settlement. As will be seen, a considerable amount of the time for which counsel seeks compensation was devoted to the argument that the Board's assessments of inmate-posed risk are arbitrary.

In support of the arbitrariness claim, counsel prepared and submitted a declaration by Dr. James Austin, whom it described as "the preeminent expert on recidivism in the California prison system." In that declaration, Dr. Austin provided a "preliminary opinion" that parole-eligible life inmates who have served past their minimum eligible parole dates are being denied parole based on evidence that does not rationally indicate that they pose a current danger to the public. He based this opinion on data available to him through his work on a prison overcrowding case known as *Brown v. Plata* (2011) 563 U.S. ___ [131 S.Ct. 1910]. To develop an opinion on whether the same is true of inmates serving past their adjusted base terms and an opinion on what considerations are "actually driving the Board's parole decisions," Dr. Austin declared that he would need further data, which counsel sought to obtain through discovery. Eight of the eleven categories of discovery counsel sought on Butler's behalf related not to the disproportionality issue for which counsel was initially appointed but instead to categories of discovery Dr. Austin opined he would need in order to provide an opinion

19

supporting the claim that the parole board's decisions were arbitrary and unrelated to safety.

Counsel had the prerogative, of course, with Butler's consent, to pursue theories that were alternatives to the one Butler originally alleged and for which this court sought its appointment. But that does not mean counsel is entitled to compensation for work done pursuing such theories. It is only the theories which Butler successfully advanced and which benefitted a large class of persons that merit an attorneys' fee award. As already discussed, the sole such theory was the one on which he originally sought relief: that the Board's refusal to set base and adjusted base terms at the outset of the parole process facilitated disproportionate punishment and hindered judicial review of claims that the denial of parole resulted in constitutionally excessive punishment. It is conceivable that Butler's pursuit of the arbitrariness theory contributed to his success on the disproportionality claim, but there is no evidence of this in the record.

A review of counsel's bills reflects the fact that a great amount of time was spent evaluating, retaining and conferring with potential and actual consultants and expert witnesses, some or perhaps all of whom were focused on the arbitrariness theory. Other than the Austin declaration, counsel has provided us no evidence explaining how the experts and consultants were used or any other information about them.[9] The declaration states that Dr. Austin was retained "to determine whether parole-eligible Life inmates who have served past their adjusted base terms are being denied parole based on evidence that rationally indicates that such inmates pose a current danger to the public." In other words, Dr. Austin was retained to provide an opinion in support of the arbitrariness theory. On this record, we cannot approve compensation for any of the expert work because we have no evidence showing it was related or contributed to Butler's success on the primary, disproportionality-related base term theory.

---

[9] In his declaration in support of the fee motion, Streeter stated, without further explanation, that "[t]he Butler Team hired two experts, Dr. James Austin and Dr. William Bielby, to assist with this case."

20

Besides the expert work, a majority of the discovery sought (8 of 11 discovery requests)—and thus presumably of the time spent crafting the discovery, preparing the motion to compel discovery and participating in the discovery conference—was likewise focused on the arbitrariness claim and not the proportionality claim on which Butler prevailed. Thus, some reduction of the time spent on discovery is also called for.

For the foregoing reasons, we will reduce the lodestar hours by 15 percent for inefficiency, duplication and overbilling and an additional 20 percent for time spent on unsuccessful claims. Thus, we find Butler is entitled to compensation for 65 percent of the time billed by his counsel to the "systemic base term" and "both"[10] categories of time. Specifically, the hours we find compensable are as follows:

| | |
|---|---|
| Partner Streeter (1981 law school graduate): | 96 hours |
| Senior Associate Jacob (2007 law school graduate): | 124 hours |
| Junior Associate Brahmbhatt (2010 law school graduate): | 154 hours |
| Paralegal (experience and certification unknown): | 40 hours |

At the hourly rates set forth above, this amounts to total fees for work on the writ of $164,700.

**Hours Billed to Fee Motion**

In addition to the lodestar for the work on the successful claim, Butler is entitled to compensation for work on the motion for fees. (*Graham v. DaimlerChrysler Corp.*, *supra*, 34 Cal.4th at p. 581.) Butler has sought to recover for 134 hours, primarily undertaken by a junior associate and a paralegal. Given the extremely thin evidentiary record and perfunctory brief compiled in support of the original motion, the number of hours seems high. On the other hand, almost all of the time was spent by the lowest billing attorney and a paralegal, and we therefore exercise our discretion to award fees for

---

**10** We do not believe counsel's decision to split the time billed to "both" the some evidence and systemic base term claims has been shown to be accurate. However, because we lack the ability to make that allocation ourselves and because we have already substantially reduced the portion of the hours allocated by counsel to the systemic base term claim for other reasons, we do not believe a further reduction of the hours is necessary.

all of the hours expended on the motion, but at the hourly rates set forth above. The total amount of fees awarded for work on the fee motion is $29,600.

## CONCLUSION

For all of the foregoing reasons, we award petitioner attorneys' fees of $194,300.

 

                                          _____

                                          Kline, P.J.

I concur:

_____

Stewart, J.

Dissenting opinion of Richman, J.

I respectfully dissent.

I agree with much of what the majority says, including that the base term challenge was only "moderately complex" (maj. opn., p. 13); that the attorneys did "not bring significant subject matter expertise or experience" to the assignment (*id*. at p. 17); that the attorneys must not be compensated "for time not well spent" (*ibid.*); and that the hours claimed by the attorneys were "excessive" (*ibid.*). I also agree with the majority that the evidence submitted by the attorneys as to hourly rates was "less than weighty" (*id.* at p. 14) and, even more significantly, that the attorneys failed to submit anything addressing the critical issue of the hourly rates for similar work. (*PLCM Group v. Drexler* (2002) 22 Cal.4th 1084, 1095 (*PLCM Group*) ["reasonable hourly rate is that prevailing in the community for similar work"]; accord, *Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 783 ["comparable work"].) Indeed, on this last point, I commend the majority for its extensive efforts to find and analyze the cases to attempt to locate such rates.

That is where my agreement ends, and I part company with the majority as to the amount of fees it awards. I do so for several reasons, including that the hourly rates it allows—even while significantly reducing some from the rates claimed—are not appropriate here. More importantly, I disagree with the amount of "reductions" the majority has taken for "inefficiency, duplication and overbilling" (maj. opn., p. 21) and the additional reduction for time spent on unsuccessful claims. In my view, those reductions do not take into account the full extent of the excess and duplication here, and, worst of all, it does not take into account how very little work was involved before the petition was resolved—in essence, ending almost before it began.

In sum, the fees awarded by the majority—while reduced by almost 60 percent from the fees requested—are too high. Way too high. By a multiple of more than three.

The basis of my disagreement can only be understood by a full exposition of all that occurred here, an exposition that does not appear from the majority opinion, which,

1

while accurate as far as it goes, does not fully describe how the petition came to be—and to be quickly resolved. Nor does it tell the whole story of the fee motion. That, I submit, requires a detailed exposition of the entire background, which is this.

## BACKGROUND

### *In Re Morganti*

The background begins in 2011, with Christopher Morganti and his lawyer, Michael Satris. Morganti, who had been found unsuitable for parole, obtained habeas corpus relief from the Sonoma County Superior Court. The warden appealed, and we affirmed, agreeing with the superior court that there was not some evidence Morganti would pose an unreasonable risk of danger to society if released from prison. (*In re Morganti* (2012) 204 Cal.App.4th 904 (*Morganti*).)

Morganti had made two other claims in his habeas petition, the second of which was that the parole board " 'systematically and arbitrarily denies parole to all parties at or near their MEPD (minimum eligible parole date), and thus is disregarding the statutory framework that makes parole the norm and denial of parole the exception.' " The trial court determined that the claim was " 'conclusory and fails to state a prima facie claim for relief.' " (*Morganti, supra,* 204 Cal.App.4th at p. 914, fn. 4.) Mr. Satris renewed the argument before us, but we declined to address it on the basis that it was moot. We also agreed with the trial court that the claim was conclusory and "not adequately developed," and noted that Morganti had failed to identify an appropriate remedy in the event he could establish a right to relief. (*Ibid.*)

Presiding Justice Kline wrote a 17-page concurring and dissenting opinion, in which he concurred "in the majority opinion in all respects save one." (*Morganti, supra,* 204 Cal.App.4th at p. 928 (conc. & dis. opn. of Kline, P. J.).) That one was this: "Christopher Morganti claims not only that the denial by the Board of Parole Hearings (the Board) of his request for parole is unsupported by 'some evidence,' but also that the Board's disregard for the statutory framework of parole and failure to accord parole applicants individualized consideration deprives him and implicitly all life prisoners a liberty interest safeguarded by article I, section 7, of the California Constitution and the

2

Fourteenth Amendment to the Constitution of the United States.  Producing evidence showing that life prisoners are almost never granted a parole release date at the time the Legislature contemplated a date would ordinarily be granted, Morganti requested the opportunity to conduct discovery and have an evidentiary hearing in order to establish a factual basis for his due process claim.  The trial court denied the request on the ground Morganti's constitutional argument was 'conclusory and fails to state a prima facie claim for relief.'  Because I believe the ruling erroneous, I would remand this case to the trial court with directions to grant Morganti's request for discovery and an evidentiary hearing."

Justice Kline's opinion went on at length, in the course of which he noted as follows:

"The evidence Morganti offered in support of his request for discovery and an evidentiary hearing raises not only the questions whether the Board is systematically violating the legislative mandate and inmates' due process rights, but whether the disconnect between the parole-granting norm prescribed in subdivision (a) of section 3041 and actual Board decisionmaking may be the result of, or related to, the Board's practice of delaying the fixing of an inmate's 'base term' until after he or she has been deemed suitable for release.  (Cal. Code Regs., tit. 15, § 2403, subd. (a).)  As I later explain, that practice—which is identical to the practice condemned by our Supreme Court in [*In re*] *Rodriguez* [(1975)] 14 Cal.3d 639 [(*Rodriguez*)] because it facilitated the imposition of disproportionate sentences and obstructed judicial review of allegedly excessive sentences—is among the matters Morganti wishes to investigate and subject to judicial review.

"In short, our determination that no evidence supports the Board's denial of Morganti's request for parole leaves entirely unaddressed his claim that the Board denies him and thousands of other life prisoners their constitutional right to individualized consideration of their parole suitability due to (1) a Board policy to almost never grant life prisoners a parole release date at the time the Legislature mandated that such a date should 'normally' be granted, and (2) the Board's administration of the parole and term-

3

setting process in a manner that does not guard against but facilitates the disproportionate sentences resulting from application of the policy." (*Morganti, supra,* 204 Cal.App.4th at p. 931 (conc. & dis. opn. of Kline, P. J.).)

**Butler's Petition For Habeas Corpus**

We filed *Morganti* in March 2012. Among those who read it apparently was Roy Butler.

On December 12, 2012, representing himself, Butler filed in this court a petition for habeas corpus, seeking review of a writ apparently filed in September 2012, in the Alameda County Superior Court and denied by it on November 15. Butler's pro. per. petition was on the approved Judicial Council form MC-275, and under "Grounds for Relief," Butler said, "The Parole Board is illegally refusing to set my sentence term." Then, in response to the question whether Butler was making an argument not made on appeal, he said, "This is a newly discovered, unaddressed provision of law." And under question No. 11, "Administrative Review," Butler asserted, "There are no administrative procedure [*sic*] that address the Board's failure to implement state law."

Butler's pro. per. petition asserted he was making six contentions, including these:

"II. The Board of Parole Hearings has instituted and followed an underground policy, by relying on declarations and conclusions made in an internal memorandum by the Attorney General to set its policy to refuse the term-fixing mandate[.]

"III. The Board of Parole Hearings is today confusing and conflating the terms 'Primary Term Fixing' and 'Parole Term Setting,' making the setting of a sentence term impossible, because it is contingent upon a finding of suitability for parole first; . . .

"IV. Parole Date-Fixing and Primary (sentence) Term-Fixing are two separate functions; the primary term is to be set (fixed) according to [Penal Code section] 1170.2(h) and the parole term is to determined thereafter according to the rules in [Penal Code section] 3041 per [*In re*] *Dannenberg* [(2005)] 34 Cal.4th 1061 [(*Dannenberg*).]

"V. Legislative Intent Is Being Ignored[.]

"VI. Petitioner's Sentence Is Unconstitutional[.]"

4

Butler's prayer for relief asked that we issue an order to show cause, appoint counsel to protect Butler's rights, order discovery and an evidentiary hearing if needed, "find that the Board has failed to comply with state law," and order the Board to fix his term.

Butler's pro. per. petition was accompanied by a 21-page, typewritten argument, included within which was reliance upon Penal Code, section 1170.2, subdivision (h); Penal Code, section 3041; *Rodriquez*, *supra*, 14 Cal.3d 639; *Dannenberg*, *supra*, 34 Cal.4th 1061; and *People v. Wingo* (1975) 14 Cal.3d 169—all authorities, not incidentally, that had been cited and discussed in Justice Kline's opinion in *Morganti*.

On January 30, 2013, we filed a three-page, single-spaced order that provided in pertinent part as follows:  "The Board of Parole Hearings (Board) does not set the 'base term' for a prisoner sentenced to life with the possibility of parole until he or she has first been found not currently dangerous and therefore suitable for release on parole.  (Cal. Code Regs., tit. 15, §§ 2402, subd. (a), 2403, subd. (a), hereafter Regs.)  In a petition for writ of habeas corpus filed in pro. per., petitioner seemingly challenges this process on two grounds:  first, that the practice violates Penal Code section 1170.2, subdivision (h), and, second, that Board deferral of the setting of the 'base term' until after an inmate is found suitable for release results in sentences disproportionate to inmates' individual culpability, because, unlike the setting of the base term, the process of determining suitability focuses almost entirely on postconviction factors unrelated to culpability or proportionality.  [¶]  Our review of the petition indicates that the second issue may benefit from further briefing."

Our order went on to discuss the holding in *Rodriguez*, and then continued:

"While the Board's practice of deferring the setting of the base term until after an inmate is determined suitable for release on parole was generally upheld by the California Supreme Court in . . . *Dannenberg*[, *supra*,] 34 Cal.4th 1061, the opinion in that case reaffirms the declaration in *Rodriguez* that the constitutional prohibition of excessive punishment is as applicable to life prisoners as to any others:  'Of course, even if sentenced to a life-maximum term, no prisoner can be held for a period grossly

5

disproportionate to his or her individual culpability for the commitment offense.' ([*Dannenberg*,] at p. 1096.) Citing *Rodriguez*, the *Dannenberg* court acknowledged that '[Penal Code] section 3041, subdivision (b) cannot authorize such an inmate's retention, even for reasons of public safety, beyond this constitutional maximum period of confinement.' (*Ibid*. . . .) As has been said, *Dannenberg* therefore 'heightens judicial responsibility to ensure that "the overriding statutory concern for public safety," which "trumps" the statutory interest in uniform sentences (*Dannenberg,* . . . at p. 1084), is not also allowed to "trump" prisoners' constitutional right to sentences proportionate to their offenses.' ([*Morganti*, *supra*,] 204 Cal.App.4th [at p.] 943 (conc. & dis. opn. of Kline, P.J.)"

Our order concluded as follows: "Given the foregoing, counsel is appointed to investigate and research whether to file a supplemental petition that: (1) refines petitioner's contention that the current practice of the Board, prescribed by the agency's regulations and approved in *Dannenberg*—i.e., setting the base term only after a finding of suitability—results in disproportionate sentences and/or obstructs judicial review of the proportionality of the sentences resulting from the Board's practice, and (2) addresses the question whether petitioner's ability to make such a showing requires discovery of statistical information and any other relevant information maintained by the Board—such as, for example, the percentage of inmates granted release on parole over a recent period of time who at the time of their release date had already served more time than their subsequently determined base term—and, if so, the manner in which discovery of such information should be carried out.

"The Clerk of this Court is directed to serve copies of the petition and exhibits on the First District Appellate Project, which is directed to arrange for the appointment of counsel. If appointed counsel decides to file a supplemental petition, that petition and any supporting documents shall be served upon the Attorney General within 30 days of the appointment order. If we decide an informal response from the Attorney General is necessary, the court will notify the parties."

6

On February 11, 2013, we filed an order submitted by the First District Appellate Project that read as follows: "Jon Streeter is appointed to represent petitioner on appeal and the case is Independent. [¶] . . . [¶] Pursuant to the Court's order dated January 30, 2013, 'If appointed counsel decides to file a supplemental petition, that petition and any supporting documents shall be served upon the Attorney General within 30 days of the appointment order.' "

**The Supplemental Petition**

On May 28, 2013, a supplemental petition for writ of habeas corpus was filed on behalf of Butler, listing as counsel "Keker & Van Nest LLP, Jon Streeter, Sharif Jacob, and Benita Brahmbhatt."

As the majority indicates, the supplemental petition went well beyond what we had requested, not limited to the "second issue [in Butler's pro. per. petition that] may benefit from further briefing." To begin with, the supplemental petition made two contentions, the first of which was that the Board's denial of parole was not supported by some evidence (the "some evidence claim"), a contention that Butler had not made in his pro. per. petition. The second contention was summarized in the supplemental petition as follows: "In addition, Butler challenges the Board's practice of refusing to set a base term of imprisonment for life-term inmates until after a parole-suitability finding. That practice, as applied to him, fails to comport with the Eighth Amendment of the United States Constitution, with article I, section 17, of the California Constitution, and, because it deprives him of a fair parole hearing before the Board and obstructs judicial review of parole denials, with the due process guarantees of the state and federal Constitutions" (the "base term claim"). The base term claim had four subparts: (1) the Board's decisions regarding whether an inmate poses an unreasonable risk to society are arbitrary; (2) under *Lawrence*, the Board is required to set an inmate's base term prior to any parole hearing; (3) the Board deprived Butler of a fair hearing by refusing to provide notice of his base term; and (4) the Board's failure to provide notice of the base term obstructs judicial review. As can be seen, none of those arguments seemingly addressed the "second issue" we determined "may benefit from further briefing."

7

The supplemental petition was 82 pages long, the first 30 pages of which was the Statement of Facts, which included these seven subjects:

"A.     Pre-Offense History

"B.     The Commitment Offense

"C.     Butler's Consideration for Probation, Sentence and Commitment to State Prison

"D.     Butler's Base Term

"E.     Post-Conviction

      "1.     Disciplinary Record

      "2.     Institutional Activities Showing Reform And Rehabilitation

      "3.     Psychological Evaluations

      "4.     Plans For Release

"F.     2012 Parole Proceedings."

As is apparent, with the possible exception of the one-page recitation of facts in category D., those facts were pertinent only to Butler's "some evidence" claim.

The memorandum of points and authorities accompanying the supplemental petition was 47 pages long, the first half of which, designated Part I, was devoted to the argument that there was not "some evidence" supporting denial of parole. As the introduction put it, this was the first of the "two types of claims" in the petition. The second claim was in Part II, described this way: "Part II raises systematic constitutional claims regarding the Board's practice of refusing to set a base term for life-term inmates until a parole suitability finding has been made." Pointing out that Butler had concurrently filed a motion for discovery, the supplemental petition ended with the request that we order the Board to provide discovery at the earliest opportunity. And the prayer for relief included that we "order the warden of the Correctional Training Facility to show cause why Petitioner's parole denial should not be vacated and why his base term should not be set" and "order discovery as requested in the concurrently filed motion."

8

On June 20, the respondent Director of Department of Corrections filed his opposition to the motion for discovery, and on July 3, Butler his reply.

On August 7, on our own motion, we ordered the petition bifurcated into two separate cases: the first, the "some evidence" claim, was numbered A137273; the second, the "base term" claim, was numbered A139411.

Against that background, on August 9, we issued an order that read as follows: "Good cause appearing from the verified supplemental petition for writ of habeas corpus on file in this action, [¶] IT IS ORDERED that the Director of the Department of Corrections and Rehabilitation show cause before this court when the matter is ordered on calendar why the relief requested in the petition should not be granted. However, briefing in this matter is deferred until resolution of petitioner's motion for discovery. That motion will be addressed in further orders from the court."

On September 24, we filed a lengthy order addressing various discovery issues, which order further advised that "the court will conduct a discovery conference with the parties on October 18." The conference was later continued at the request of the Attorney General to October 23.

**The October 23 Conference and the Settlement**

Justice Kline began the conference with some introductory comments, among which was the observation that, while it was not the expressed purpose of the conference, the parties might be well advised to address possible settlement, going on to offer the possible participation of two justices on the court with significant experience in prison-related issues. The conference then went on for some time addressing discovery issues, and ended with the understanding that the parties would advise the court about the feasibility of discussing possible settlement.

Two days later, on October 25, the court received a letter from Butler's counsel that, as described in the court's file, advised that the "parties agree to accept the suggestion to participate in a settlement conference supervised by Justice Humes or Justice Siggins. . . ; no assurances can be made that parties will reach a settlement so willing to proceed immediately with discovery in the areas of agreement . . . ; parties

9

agreed that submission for decision of those issues they cannot agree should be deferred until they have the opportunity to explore possible case resolution at the settlement conference . . . ; parties wish to be in a position to report back to panel very soon following the settlement conference so that whatever discovery issues remain outstanding at that point may be submitted for decision without significant delay . . . ."

Justice Humes agreed to conduct settlement negotiations, and a settlement conference was held before him on November 20, lasting less than four hours. That conference was apparently productive, to the extent that on the next day, November 21, Butler's counsel drafted a "stipulation re proposed settlement order." The proposed order was finalized and sent to the Attorney General the next day. The Attorney General responded, and by December 3 the settlement agreement had been revised again.

A second session was held with Justice Humes on December 6, lasting less than two hours. That day the settlement agreement was revised and sent to the Attorney General. By December 11, Butler's counsel had drafted a press release.

A final session with Justice Humes occurred on December 13, lasting an hour or so. On that date, the parties signed a three-page "stipulation and [proposed] order regarding settlement" that concluded as follows:

"[PROPOSED] ORDER

Pursuant to the foregoing stipulation, and good cause appearing, IT IS HEREBY ORDERED that: [¶] . . .

"3.     The Board shall, at the next publicly noticed Board meeting, announce a policy of calculating the base term and the adjusted base term for all life term inmates at the initial parole consideration hearing. The Board will implement this policy on the first day of the calendar month following the aforementioned meeting.

"The base term will be established pursuant to the matrices and directives found in California Code of Regulations, title 15, sections 2282–2284, 2320-2321, 2329, 2403–2405, 2423–2425, and 2433–2435.

10

"The adjusted base term refers to the base term after it has been adjusted for enhancements pursuant to California Code of Regulations, title 15, sections 2285–2288, 2322–2326, 2406–2409, 226–2428, and 2436–2438.

"4.     For any life term inmate who has already had his or her initial parole consideration hearing without a calculation of the base term and adjusted base term, the Board shall calculate the base term and adjusted base term at the inmate's next scheduled parole consideration hearing that results in a grant of parole, a denial of parole, a tie vote, or a stipulated denial of parole.

"5.     The Board shall, within 90 days of this order going into effect, initiate the process to amend its regulations to reflect the base term setting practices described in this order, in accordance with Government Code, section 11340 et[] seq.

"6.     The Board shall cite this order and submit it as supporting documentation in its initial statement of reasons, as required by Government Code, section 11346.2, subdivision (b).

"7.     The Board shall in good faith seek to complete the rule-making process as soon as reasonably practicable.

"8.     This Court shall retain jurisdiction of this case until the amended regulations, conforming to the base term setting practices as described in this order, become effective."

The proposed order was signed by Justice Kline on December 16, 2013.

**The Motion For Attorney Fees**

On October 21, 2014, Butler filed a "Motion for Request for Award of Reasonable Attorneys' Fees" (motion or fee motion). The motion was brought pursuant to Code of Civil Procedure section 1021.5 and sought $439,421.65. The motion was accompanied by a memorandum of points and authorities and a declaration of Mr. Streeter. That declaration was 15 paragraphs long, five of which identified the five exhibits attached to the declaration, one of which was the profiles of the three attorneys listed on the supplemental petition: Mssrs. Streeter and Jacob and Ms. Brahmbhatt. Concerning these attorneys, Mr. Streeter's declaration asserted as follows: "4. Keker & Van Nest

11

specializes in complex civil litigation. Typically, in order to handle complex cases, we assign teams of attorneys who work collaboratively, led by a partner in the firm. The issues in this case were complex, factually and legally, and justified assigning a team of attorneys, in accordance with our firm's usual practice. As is typical for our approach of staffing cases, I assigned attorneys of varying levels of experience. The staffing structure here consisted of me, at the most senior level, assisted by Mr. Jacob, a senior associate, and Ms. Brahmbhatt, a junior associate. I personally coordinated, managed, and made all strategically important judgments on every aspect of the work on Mr. Butler's case."

Mr. Streeter's declaration went on to assert that the firm was "claiming fees only for time spent litigating Mr. Butler's base term claim and for the Fee Motion. However, Keker & Van Nest used a single billing code for time spent on all matters related to Mr. Butler's case. As a result, it is not possible to determine from evaluating the billing code connected to the time entry whether a time entry was attributable to Mr. Butler's systemic base term claim, which is the subject of this Motion, or to other matters, such as Mr. Butler's individual claim, for which Keker & Van Nest is not seeking to recover fees. [¶] 7. I have reviewed all of the billing invoices, and excluded all entries that do not appear to relate to time spent on the base term claim or the Fee Motion. In instances where a time entry relates to time spent on both the individual claim and the base term claim, I have employed a categorical rule to claim 50% of that time for this fee motion. It is my belief that we have allocated fees in a conservative manner to ensure that fees are not inadvertently claimed for work done on any issues other than the base term claim or the fee motion."

Mr. Streeter's declaration included Exhibit "C," which he described as a "summary of the attorney and paralegal hours that were billed during the course of this matter. This summary includes tables listing (1) attorneys' fees by task category and biller; (2) total attorneys' fees by time keeper; and (3) total attorneys' fees and hours billed by month." This summary represented that, exclusive of the fee motion itself, the total number of hours for which fees were sought was 640.82, representing 320.69 hours allocated to the base term claim, and 320.13 hours (1/2 of 640.25 hours) allocated to the

some evidence claim. The motion also sought fees for 134.18 hours spent on the fee motion. As to the rates for the respective attorneys, the motion sought $950 per hour for Mr. Streeter, $575 per hour for Mr. Jacob, a 2007 graduate of law school, and $500 per hour for Ms. Brahmbhatt, a 2010 law graduate who had joined the firm in fall 2011. These were, Mr. Streeter declared, the "standard billable hourly rate(s)."

On November 5, the Attorney General filed vigorous opposition to the motion, asserting two arguments: (1) section 1021.5 fees were not supported; and (2) the requested fees were unreasonable. Among other things, the second argument asserted this: "Here, it is not possible for this Court to carefully review attorney documentation of the hours expended because counsel has provided no such documents. [Citation.] Rather than provide detailed billing records, counsel provides a spreadsheet containing hours allegedly spent on the case, with no detail or explanation as to how the hours were spent. Moreover, since counsel used a single billing code for this bifurcated case, 'it is not possible to determine from evaluating the billing code whether a time entry was attributable to Mr. Butler's base term systematic claim.' (Decl. of Jon Streeter at p. 3.) Instead, counsel has 'reviewed the billing invoices' and, without any showing of proof, concluded that a certain number of hours were spent on the base term claim as opposed to other issues addressed in this case. (*Id*. at pp. 3–4.) This failure to provide any documentation as to the content of these billing invoices leaves respondent unable to challenge the basis of counsel's calculation, and is cause to deny the motion."

Despite that, the Attorney General went on to criticize, however generally, the cumulative hours spent on various tasks. The opposition also asserted that "Butler provides no evidence that the hourly rates claimed—which range between $500 and $950 per hour—are the 'prevailing hourly rates' for comparable legal services in the community." And, the opposition went on: "[E]xperienced and capable attorneys at the First District Appellate Project who handled the vast majority of pro se habeas petitions filed in this Court, bill at a rate of $65 to $86 per hour. (First District Appellate Project Hourly Rates for Panel Attorney Compensation <http://www.fdap.org/c-rateinfo.shtml> [as of Nov. 3, 2013].) . . . And if this case had been brought in the federal courts,

13

appointed counsel for a pro se inmate such as Butler could bill no more than $125 per hour. (Criminal Justice Act Compensation Rates <http://www.uscourts.gov/ federalcourts/appointmentofcounsel/cjaguidelinesforms/vol7partA/vol7partachapter2.asp x#230_16> [as of Nov. 3, 2014].) The rates alleged by Butler's counsel may be standard in the context of corporate civil litigation, but do not reflect the rates charged by attorneys who regularly practice in the field of criminal and correctional appeals."

Butler filed a reply, which did not address the absence of records.

On December 1, we set the matter for oral argument on December 17, advising the parties that "In addition to the issues raised in the briefing, the court is interested in the following additional issues:  [¶] 1.  Whether the record before us provides an adequate basis upon which to determine a reasonable fee."

On December 15, we received a "Declaration of Sharif E. Jacob in Support of Petitioner's Motion to Supplement the Record."  The declaration attached as an exhibit what Mr. Jacob described as "a true and correct copy of a spreadsheet listing the line-item billing entries for all legal work Keker & Van Nest LLP had performed on behalf of Mr. Butler as of the date of filing his motion for attorneys' fees.  Exhibit 1 formed the basis for the fee calculations set forth in Exhibit C to the October 21, 2014 declaration of Jon B. Streeter.  The data in the first six columns in Exhibit 1 were copied directly from the contemporaneous billing entries of the timekeepers at Keker & Van Nest LLP—both attorneys and paralegals."

Mr. Jacob's declaration also stated that "Exhibit 1 is color-coded to indicate which billing entries are recoverable.  Billing entries highlighted in yellow record the work on Case No. A139411, for which Mr. Butler seeks a 100% recovery of attorneys' fees. Entries highlighted in orange record the work for Case No. A137273, for which Mr. Butler has not sought a recovery of fees.  Each entry highlighted in green related to work for both Case Nos. A139411 and A137273.  Therefore, Mr. Butler seeks a 50% recovery of green-coded fees.  Entries highlighted in blue relate to work for matters other than Case Nos. A139411 and A137273."

14

The Attorney General filed opposition to Butler's motion to supplement the record.

That was the context in which the fee motion came on for oral argument. While the argument was lengthy, the Attorney General was not able to attack the fee request in any specific way, because the specific time spent on any specific task was not in the record.

At the conclusion of the argument, we ordered that Mr. Jacob's supplemental declaration would be filed, with the Attorney General able to file a supplemental opposition, and Butler a reply. That briefing has now been received.

### DISCUSSION

I have no quarrel with the majority's exposition of the law which, distilled to its essence, holds that attorneys are to be compensated for all hours *reasonably* spent at *reasonable* hourly rates for *comparable* or *similar* work.

That said, a few settled principles bear emphasis, including that a party seeking attorney fees "is not necessarily entitled to compensation for the value of attorney services according to its own notion or to the full extent claimed by [him]." (*Salton Bay Marina, Inc. v. Imperial Irrigation Dist.* (1985) 172 Cal.App.3d 914, 950.) And a party seeking fees has the "burden of showing the fees incurred were 'allowable,' were 'reasonably necessary to the conduct of the litigation,' and were 'reasonable in amount.' " (*Levy v. Toyota Motor Sales, U.S.A., Inc.* (1992) 4 Cal.App.4th 807, 816.) In short, the attorneys must prove the hours sought were reasonable and necessary. (*El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1366.) And, of course, the rates must be for comparable, similar work.[1]

---

[1] One other attorney fee principle bears noting, this from *Serrano v. Unruh* (1982) 32 Cal.3d 621 (*Serrano IV*), where the Supreme Court cautioned as follows:

"Nonetheless, the federal rule does not license prevailing parties to force their opponents to a Hobson's choice of acceding to exorbitant fee demands or incurring further expense by voicing legitimate objections. *Prevailing parties* are compensated for hours reasonably spent on fee-related issues. A fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny

15

I end my brief discussion of the attorney fee law with another oft-cited principle, here as stated in *PLCM Group*: " 'It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court . . . . [Citations.] The value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citation.] The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony. [Citations.] The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' (*Melnyk v. Robledo* (1976) 64 Cal.App.3d 618, 623-624.)" (*PLCM Group, supra,* 22 Cal.4th at p. 1096.)

Here, of course, there is no trial court, as the petition originated in our court. And the cases that speak in terms of the "expertise" of the court awarding the fee is a fortiori applicable here, where the issue might be said to be uniquely within our expertise, this court uniquely positioned to determine the fee: we appointed counsel; we instructed

one altogether.[21] 'If . . . the Court were required to award a reasonable fee when an outrageously unreasonable one has been asked for, claimants would be encouraged to make unreasonable demands, knowing that the only unfavorable consequence of such misconduct would be reduction of their fee to what they should have asked in the first place. To discourage such greed, a severer reaction is needful. . . .' (*Brown v. Stackler* (7th Cir. 1980) 612 F.2d 1057, 1059.)" (*Serrano IV,* at p. 635.)

The referenced footnote 21 said this: "See, e.g., *Copeland v. Marshall* [D.C. Cir. (1980)] 641 F.2d 880, 902–903 [not allowable are hours on which plaintiff did not prevail or 'hours that simply should not have been spent at all, such as where attorneys' efforts are unorganized or duplicative. This may occur . . . when young associates' labors are inadequately organized by supervising partners' (fns. omitted)]; *Gagne v. Maher* [2d Cir. (1979) 594 F.2d 336, 345 [excessive time spent]; *Lund v. Affleck* (1st Cir. 1978) 587 F.2d 75, 77 [if initial claim is 'exorbitant' and time unreasonable, court should 'refuse the further compensation']; *Reynolds v. Coomey* (1st Cir. 1978) 567 F.2d 1166, 1167 [duplication of effort]; *Farris v. Cox* (N.D.Cal. 1981) 508 F.Supp. 222, 227 [time on fee petition denied for 'overreaching']; *Vocca v. Playboy Hotel of Chicago, Inc.* (N.D.Ill. 1981) 519 F.Supp. 900, 901–902 [fee denied in entirety on ground of counsel's dilatoriness and hours claimed for clerical work]; *Jordan v. United States Dept. of Justice* (D.D.C. 1981) 89 F.R.D. 537, 540 [fee denied in entirety on ground of unreasonable request and inadequate documentation]." (*Serrano IV, supra,* 32 Cal.3d at p. 635, fn. 21.)

16

counsel precisely what to brief; we oversaw the one non-settlement conference held in the case; and we suggested the early attempt at settlement which quickly resolved the matter.  Superimposed on all this is that Justice Kline's opinion in *Morganti*, with its authorities and its analysis, served as the very template of Butler's claim.[2]

In sum, the fees awarded are to compensate for all hours reasonably expended at a reasonable hourly rate for the litigation.  The position of Butler's attorneys is that they are entitled to $439,421, to be compensated for 640.82 hours at hourly rates ranging from $500 to $950.  The Attorney General contends that those hours are greatly inflated and the hourly rates sought way too high.  The majority agrees generally with the Attorney General, to the extent that it reduces the claim significantly to award the attorneys $194,300.  As indicated, I think that is still way too high.

**The Appropriate Fee is $61,000**

Taking up first the appropriate hourly rate, it is that for comparable or similar work.  The majority notes that "neither party provided an adequate record upon which we could confidently assess appropriate hourly rates for this case" (maj. opn., p. 15), and on its own consulted numerous cases from both California and federal courts for that analysis.  The majority goes on to reduce the hourly rates of the three attorneys, curiously in different percentages:  Mr. Streeter from $950 to $800; Mr. Jacob from $575 to $350; and Ms. Brahmbhatt from $500 to $250.  Passing over the discrepancies in the amount of reduction, there is nothing in any of the cases cited in the majority opinion supporting an $800 hourly rate for Mr. Streeter—indeed, not one case supports that rate for any attorney.  The highest hourly rate in any of the cases is $750, and that for attorneys with significantly more experience, not to mention experience in the area of law involved in the case.  No such experience is manifest here where, again to quote the majority, the attorneys did "not bring significant subject matter expertise or experience."  (Maj. opn., p. 17.)

---

[2] Indeed, a very early attorney time entry, on April 2, 2013, describes the work as "research *Morganti* claim."

Moreover, contrary to the majority, I would submit that the Attorney General did provide some relevant information.  Specifically, the Attorney General's opposition offered that "experienced and capable attorneys at the First District Appellate Project who handled the vast majority of pro se habeas petitions filed in this Court, bill at a rate of $65 to $86 per hour.  (First District Appellate Project Hourly Rates for Panel Attorney Compensation <http://www.fdap.org/c-rateinfo.shtml> [as of Nov. 3, 2013].) . . . (Exh. 1, Decl. of Amber Wipfler at p. 2.)  And if this case had been brought in the federal courts, appointed counsel for a pro se inmate such as Butler could bill no more than $125 per hour.  (Criminal Justice Act Compensation Rates<http://www.uscourts.gov/federalcourts/ appointmentofcounsel/cjaguidelinesforms/vol7partA/vol7partachapter2.aspx#230_16> [as of Nov. 3, 2014].)"

An argument could be made that those rates should guide us here, as the dedicated attorneys who take on such appointed counsel assignments—attorneys like Mr. Satris and his colleagues—do so willingly, thus providing some evidence of an appropriate market rate.  In fact, the billing entries from Butler's attorneys reveal just how apt is the experience of the attorneys, how much Butler's attorneys sought them out and relied on them.  For example, those records reveal that Butler's attorneys spent a significant amount of time meeting with, talking to, and reviewing written materials from, lawyers who in fact had significant experience in this area of law—most significantly, Mr. Satris, the very attorney who represented Morganti, and who first made the argument reiterated here that ultimately led to the settlement.[3]  In short, Butler's attorneys looked to, and relied on, Mr. Satris and other "parole attorneys" and "parole specialists."

---

[3] The attorneys' time entries include numerous entries reflecting interaction with, and reliance upon, Mr. Satris, for which the motion seeks significant fees.  These entries include "compile Satris materials" (3/5/13); "review background materials provided by Satris" (3/5/13); telephone calls to Satris (11/20/13); conferences with Satris (5/16/13; 11/16/13); and e-mails to Satris (10/18/13).  Other entries indicate that the attorneys were interacting with "parole specialists" (e.g., 3/4/14, 3/6/13, 3/15/13 [3.75 hours "draft memo re telephone calls with parole specialists"]) and "parole attorneys" (3/1/13).

That said, I would not limit the fees to less than $200, but I would approach the hourly rate issue from a different perspective, and would allow what might be called a blended hourly rate of $325 per hour for all work on the matter.

The next issue is the number of hours for which the attorneys be compensated. As I understand it, the majority concluded it is 414, a number arrived at by reducing the hours claimed by a total of 35 percent: "15 percent for inefficiencies, duplication and overbilling and an additional 20 percent for time spent on unsuccessful claims." (Maj. opn., p. 21.) While I appreciate that the majority reduces the hours claimed, I find no compelling explanation as to why the reductions are 15 and 20 percent, as opposed to, say, 45 and 30 percent, or even 50 and 35 percent.

Beyond that, I disagree in some fundamental ways with the majority, beginning with its willingness, however grudging, to accept the "categorical rule" employed by Mr. Streeter to claim 50 percent of the work supposedly billed to both the some evidence claim and the base term claim. The majority says in footnote 10 that "We do not believe counsel's decision to split the time billed to 'both' the some evidence and systemic base term claims has been shown to be accurate. However, because we lack the ability to make that allocation ourselves and because we have already substantially reduced the portion of the hours allocated by counsel to the systemic base term claim for other reasons, we do not believe a further reduction of the hours is necessary." I believe such allocation can be made.

As the majority recognizes, the record supporting the claim for attorney fees is hardly precise, especially as the attorneys used a "single billing code." Then, well after the fact, Mr. Streeter analyzed the time entries made under that single billing code, and among other things determined that many of those entries represented work that applied to both the some evidence claim and the base term claim. So, in Mr. Streeter's words, he "employed a categorical rule" to claim 50 percent of that time for the base term claim. Maybe he did, but that does not mean that application of the "categorical rule" was reasonable. Or that 50 percent of that time reflects a reasonable amount of time for the one claim that was in fact settled.

19

According to the Attorney General's analysis in her supplemental opposition—an analysis Butler does not dispute in his supplemental reply—the attorneys billed 326.20 hours just for the supplemental petition, for which they sought $203,517.75. As best we can tell, those hours were allocated in the green category as described in Mr. Jacob's declaration, designated "both" the some evidence claim and the base term claim. Conversely, no time for the supplemental petition was allocated to the orange category, the some evidence claim, or for that matter to the yellow, the base term claim. But as indicated above, most of the supplemental petition addressed the some evidence claim: 30 of 31 pages of facts and 19 pages of argument. By contrast, four paragraphs of fact and some 12 pages of argument referred to the base term claim. I do not understand how 50 percent of the "green" hours can reasonably be attributable to the base term claim.

Moreover, the Attorney General's supplemental opposition argued as follows: that of the 326.20 hours supposedly attributable to the supplemental petition, "only 171.55 hours ($105,498.25) were spent on research, drafting, and review. (Exh. 4, Chart of Expenses re: Petition Research/Drafting/Review.) The remaining 112.12 hours ($69,869.25) were spent on communication between counsel, including e-mails, conferences, meeting preparation, and preparing legal memoranda and task lists for team distribution. (Exh. 5, Chart of Expenses re: Petition Communications.) As explained in [*Christian Research Institute v.*] *Alnor* [(2008)] 165 Cal.App.4th [1315,] 1326, a significant amount of time spent on communication, as opposed to research and writing, is evidence of overstaffing. There, the court noted that 'the five attorneys Alnor deployed on the motion appear to have expended more time telephoning, conferencing, and e-mailing each other than on identifiable legal research for the motion, supporting the trial court's conclusion that the matter was overstaffed.' (*Ibid.*) Here, too, respondent (and in turn, the taxpayers of California) should not be financially responsible for counsel's decision to employ multiple attorneys, particularly when no showing has been made that the case required such."

Again, Butler's supplemental reply did not take issue with the Attorney General's representations. Rather, Butler responded this way: "*First*, Respondents have presented

20

no evidence in support of their contention that the time spent drafting Petitioner's habeas petition was excessive. Petitioner was appointed to address an extraordinarily complex legal issue that has vexed the California Courts for over forty years. The question presented—one of first impression—has produced case law that Respondents themselves argue is contradictory. It also implicates the complex statutory and regulatory reforms that accompanied the Determinate Sentencing Law. Petitioner's own time records supply the only objective evidence of how much time it took to prepare his supplemental petition. *See Horsford*, [*v. Board of Trustees of California State University* (2005) 132 Cal.App.4th [359,] 396 ('[T]he verified time statements of the attorneys, as officers of the court, are entitled to credence in the absence of a clear indication the records are erroneous.'). Nonetheless, Petitioner also submitted the declaration of Michael W. Bien, who has extensive experience in attorneys' fees litigation, concluding that the hours expended were entirely reasonable and 'comport with standard practice employed by law firms in the Bay Area.' Decl. of Michael W. Bien ¶¶ 18–21, Nov. 11, 2014. Petitioner's request for the time spent preparing the habeas petition is reasonable, and Respondents have presented no evidence to the contrary."

Responding first to the reliance on Mr. Bien's declaration, I offer only that this court, with its significant experience in habeas related litigation, need not be impressed with an attorney's declaration that, in Butler's words, opines that "the hours expended were entirely reasonable."[4]

---

[4] One aspect of Mr. Bien's declaration deserves some mention, his testimony in paragraph 23: "Courts and Congress, in order to encourage attorneys to act as private attorneys general, and to take on clients with meritorious claims without regard for their ability to pay, have recognized the need to fully compensate attorneys for the successful prosecution of civil rights cases. Consequently, attorneys who litigate on a wholly pro bono basis expect to receive, at minimum, current market hourly rates in cases where the end goal is to vindicate important constitutional rights affecting the public interest on behalf of clients who have no ability to fund such litigation. In my experience, most lawyers will take on these kinds of important cases with the possibility of achieving broad-based reform only if there is the prospect that if successful, they may be fully compensated for their work."

But beyond that, the issue is not "how much time it took to prepare" the supplemental petition. The issue, the only issue, is what is reasonable for that preparation.

As Mr. Streeter's declaration indicated, and the itemized statements confirm, three attorneys were involved in essentially every task. The Attorney General's objections included that the staffing with multiple levels of attorneys was improper, and should not be compensated by the taxpayers of California. I agree, as do the majority, at least to an extent.

Multi-layer staffing was hardly necessary here. It might be that the firm staffs matters that way. It might also be, as Butler quotes, citing *Premier Medical Management Systems, Inc. v. California Ins. Guarantee Assn.* (2008) 163 Cal.App.4th 550, 562, that "[c]ollaboration does not necessarily amount to duplication that is not compensable." But that does not mean that the taxpayers of California should pay for it. Indeed, from what I read, such multi-layer staffing is not even compensable in the commercial world in which the firm typically operates.

For example, as early as 2008, a New York State Bar Journal discussed client trends: "In the past 10 years, the legal profession has gone from a supply industry to a demand industry. This means clients are now in control; they are insisting on quality service at a competitive price. They are taking a more active role in the management of their cases and are controlling both the practice methods and the billing practices of their lawyers. These are some of the emerging trends . . . ." (Greene & Boyer, *Professional Staffing in the 21st Century* (Sept. 2008) New York State Bar J. 1.)

Three years later, another article in the same journal began by observing that "The traditional law firm model [had] undergone a perfect storm. Clients are demanding increased efficiency and lower costs, refusing to pay for 'armies' of junior associates to work on their litigation." (Durkin, *A Whole New World* (Sept. 2011) New York State Bar

I hope—indeed, trust—that most attorneys who accept pro bono service do not share Mr. Bien's extreme money-making motivation. And, it should be noted, at oral argument Butler's counsel disavowed Mr. Bien's "testimony."

22

J. 1.)  And a 2010 article in The American Lawyer stated:  "[A]ssertiveness by general counsel, especially in the area of billing, has been increasing, our firm leaders survey found.  'Clients have been more vocal as to how matters are staffed,' . . . .  'They want to feel like they're getting the best value.'  In our firm leaders survey, nearly 47 percent of respondents said that clients have refused to pay for work done by first- or second-year associates—a development that Pisa says is part of clients' strategy to shift economic risk back to law firms."  (Zillman, *The New Normal*, The American Lawyer (Dec. 2010) p. 68.)

In sum, it appears that commercial clients refuse to pay for the training of associates—or, for that matter, the learning curve involved in developing an expertise.  If this is true of commercial clients, it should certainly be applicable to a fee award under section 1021.5.  (See *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 231 ["The city's good faith . . . cannot shield it, although the court making the award is certainly entitled to consider financial burden on a city as one guide to the exercise of its discretion in setting the amount (though not the propriety) of the award.]  (*Serrano* [*v. Priest* (1977)] 20 Cal.3d 25, 49 [(*Serrano III*)].)"

As indicated, Butler is not seeking any fees for the work claimed to have been done on the some evidence claim.  Nevertheless, the amount of time spent on that claim can be circumstantially relevant on the reasonableness—more accurately, unreasonableness—of the time spent on the representation of Butler.

To put the matter in perspective, the total factual record on the some evidence issue was 237 pages, consisting of a 118-page transcript of the parole hearing and 119 pages of exhibits, including the psychological evaluations and the letters from Butler's grandmother and mother.  That was it.  As to the governing law, it is very contained, and easily found in the Supreme Court cases of *In re Shaputis* (2008) 44 Cal.4th 1241, *Dannenberg, supra,* 34 Cal.4th 1061, or *In re Lawrence* (2008) 44 Cal.4th 1181, not to mention in any of the nine published opinions from our court holding in favor of inmates: *In re Stoneroad* (2013) 215 Cal.App.4th 596; *Morganti, supra,* 204 Cal.App.4th 904; *In re Young* (2012) 204 Cal.App.4th 288; *In re Moses* (2010) 182 Cal.App.4th 1279; *In re*

*Juarez* (2010) 182 Cal.App.4th 1316; *In re Barker* (2007) 151 Cal.App.4th 346; *In re Elkins* (2006) 144 Cal.App.4th 475; *In re Scott* (2005) 133 Cal.App.4th 573; and *In re Scott* (2004) 119 Cal.App.4th 871.

Against that background, the attorneys claim to have spent 866 hours on the some evidence claim, which efforts consisted essentially of the petition, as the claim was never heard. It is, frankly, astonishing.[5]

So, too, is the amount sought for the fee motion itself, for which the attorneys claim 134 hours. While the majority does not award fees in the full hourly rates requested, it does award fees for all hours claimed. I vigorously disagree.

The fee motion included a 17-page memorandum of points and authorities—seven pages of introduction, two pages discussing the legal standard of section 1021.5, and eight pages arguing why Butler was successful. The memorandum cited six cases. The fee motion also included a three-and-a-half-page, 15-paragraph declaration of Mr. Streeter. And for that the fee motion sought over $54,000, for some 134 hours of work.

The Attorney General criticized the amount sought and the hours claimed, as follows: "Counsel billed a total of 123.90 hours ($49,643.60) to the fee motion, but of these hours, only 47.93 were spent researching and writing the 17-page motion and accompanying declaration. (Exh. 8, Chart of Expenses re: Fee Motion; exh. 9, Chart of Expenses re: Research/Drafting of Fee Motion.) The remaining 75.97 hours were spent on e-mails, conferring with a paralegal, and reviewing billing records. (Exh. 8.) Similarly, the paralegal billed 58.08 hours ($15,100.80) on the fee motion, most of which (53.45 hours and $13,897) was spent on conferences with counsel and a one-page spreadsheet. (Exh. 10, Chart of Expenses re: Paralegal Work on Fee Motion; exh. 11, Chart of Expenses re: Paralegal Work on Spreadsheet.) Respondent should not be held responsible for counsel's failure to properly maintain billing records, and the resulting time (and money) spent identifying tasks related to the base term claim. Nor should

---

[5] We have heard that when the Attorney General assigns a deputy to respond to some evidence cases, the budgeted hours are usually 25 to 30.

respondent be expected to pay for the unreasonable amount of time—nearly seven 8-hour days—spent preparing a single spreadsheet."

Butler's entire reply was this: "***Fourth***, despite vigorously contesting every single element of Petitioner's entitlement to fees, Respondents contends [*sic*] that Petitioner spent too much time preparing his fee application. '[F]ees recoverable under section 1021.5 ordinarily include compensation for all reasonably spent, including those necessary to establish and defend the fee claim.' *Serrano* [*IV*, *supra*,] 32 Cal.3d [at page] 639. In opposing a fee award, Respondents' primary argument is that Petitioner failed to submit sufficient evidence in support of his fee claim. Ironically, Respondents then proceed to object that Petitioner spent too much time preparing the voluminous set of color-coded contemporaneous billing entries that Respondents argued was absolutely necessary. 'While attributing no bad faith to the Attorney General's office for its conduct of this litigation, . . . government "cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response." ' *Id.* at 638."

That reply misses the point. While the Attorney General is contesting the amount sought in the motion, her argument is that the original fee application is excessive. The attorneys make no effort to justify the entries criticized by the Attorney General. And the hours claimed are manifestly excessive.

One final indication of overbilling, however relatively minor in the scheme of things, is shown by the time entries after November 20. As indicated above, it appears that as early as the conclusion of the first settlement conference on November 20, the parties were optimistic about resolving the case, the attorneys drafting a settlement agreement the next day, November 21. The settlement agreement was in fact signed on December 16. And the only intervening proceedings were the short settlement conference on December 6, following which the attorneys prepared a press release, and the brief conference on December 16, when the settlement agreement was signed. The attorneys sought some 51 hours of attorney fees for the period after November 21.

As indicated, the majority reduced the hours claimed by a total of 35 percent, to arrive at what might be called the reduced lodestar. As noted, I cannot find any

25

meaningful explanation of how that reduction was arrived at. Regardless, I believe that what experienced trial courts do is determine the reasonable number of hours required on the case, and then reduce the lodestar by an appropriate percentage to reach those hours. And that is what I have done.

Butler's supplemental reply introduces his position this way: "After extensive litigation, including the filing of a supplemental habeas petition, analysis by statistical and parole experts, informal and formal briefing, a contested discovery motion, and multiple settlement conferences, Mr. Butler entered into a settlement agreement vindicating the constitutional right of all parole-eligible life inmates to have their base terms set promptly." I see it differently.

The litigation was hardly extensive. Rather, it consisted of this: the supplemental petition (more specifically, some 12 pages of argument in the supplemental petition); the discovery request; a conference on discovery; two days later, indications that the parties would engage in settlement discussions; and a signed settlement agreement seven weeks later, at the conclusion of three brief settlement conferences. The question is, what is a reasonable fee for that work.

I have analyzed the issues involved in connection with the base term claim, and the extent of the litigation reasonably involved to reach settlement of that claim. That analysis leads me to conclude that the reasonable number of hours of work for that claim should have been 188, broken down into the following tasks, estimated to take the following hours:

| | |
|---|---|
| supplemental petition | 30 hours |
| discovery | 40 hours |
| discovery conference (including preparation) | 10 hours |
| settlement conferences (including preparation) | 30 hours |
| settlement agreement | 8 hours |
| miscellany | 50 hours |
| fee motion | 20 hours |

One hundred, eighty-eight, I conclude, is the number of hours that should have been reasonably spent to achieve Butler's success, which, multiplied by $325 per hour, leads to a fee award of $61,100.  That, I conclude, is what the taxpayers of California should pay to Butler's attorneys.

_____

Richman, J.

27